**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| _____ : | | |
| In re: | : | **Chapter 7** |
| | : | |
| **AVRIO GENETICS, LLC,** | : | **Case No. 23-10097-PMM** |
| **fka PROCREATIVE, LLC ,** | : | |
| | : | |
| **Debtor.** | : | |
| _____: | | |
| | : | |
| **BONNIE B. FINKEL, as Chapter 7** | : | |
| **Trustee of Avrio Genetics, LLC,** | : | **Adversary No.** |
| | : | |
| **Plaintiff,** | : | |
| v. | : | |
| | : | |
| **JAMES D. STRADER, and** | : | |
| **BOCA MEDICAL, LLC,** | : | |
| | : | |
| **Defendants.** | : | |
| _____: | | |

**COMPLAINT**

Bonnie B. Finkel, the chapter 7 Trustee (the "Trustee" or "Plaintiff") for the estate of

Avrio Genetics, LLC, f/k/a Procreative, LLC ("Avrio" or the "Debtor"), by and through her

attorneys, Peter J. Weidman of Weidman Law, LLC, and David Banks of Banks and Banks, files

this Complaint and asserts the following causes of action against James D. Strader ("Strader")

and Boca Medical, LLC ("Boca" and, together with Strader, the "Defendants").

**SUMMARY OF ACTION**

1.      In this adversary action, the Trustee seeks damages exceeding $4.75 million and

related relief from Strader, a former manager and officer of Avrio, and Boca, a 50% owner of

Avrio, because the Defendants breached their fiduciary duties to the company, misappropriated

and converted corporate funds, usurped corporate opportunities, wasted and fraudulently

conveyed corporate assets, defrauded customers, and misappropriated customer deposits, among

other misconduct, all of which stripped Avrio of substantial money, assets and opportunities, and

caused it to become insolvent, suffer operating losses, experience deepening insolvency and

losses, and be forced into bankruptcy with more than $4.75 million claimed by its creditors.

<u>**JURISDICTION AND VENUE**</u>

2.      This Court has original jurisdiction over the subject matter of this action pursuant

to 28 U.S.C. §§ 157 and 1334.

3.      This Court has supplemental jurisdiction over Plaintiff's state law claims under 28

U.S.C. § 1367(a).

4.      This is an adversary proceeding pursuant to Rule 7001 of the Federal Rules of

Bankruptcy Procedure.

5.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409 because

this adversary proceeding arises under and in connection with a case under 11 U.S.C § 101, *et*

*seq.* (the "Bankruptcy Code").

6.      This matter is a "core" proceeding pursuant to 28 U.S.C. § 157(b).

<u>**PARTIES**</u>

7.      Plaintiff, Bonnie B. Finkel, is the chapter 7 trustee for the bankruptcy estate of the

Debtor.

8.      The Trustee has an affirmative duty to maximize the value of the property of the

Debtor's estate, and the power to assert claims and causes of action on behalf of the Debtor

under § 541 of the Bankruptcy Code.

9.      The Debtor, Avrio, is a limited liability company organized and existing under Pennsylvania law with its principal place of business located at 3467 Trexler Blvd, Allentown, PA 18104.

10.     Defendant Strader is an adult individual who, on information and belief, resides at 555 Church Street, Nashville, TN 37219.

11.     Defendant Boca is a limited liability company that is organized and exists under Texas law and, on information and belief, maintains its principal place of business at 18756 Stone Oak Parkway, Suite 200, c/o SH, San Antonio, TX 78258-4354.

12.     Strader, as Trustee of the James D. Strader 2014 Trust, is the sole member of Boca, and, at all relevant times, served as the company's President and sole manager, controlled all of its activities, and, as to Boca, acted within the scope of his duties and authority.

## PROCEDURAL BACKGROUND

13.     On January 13, 2023 (the "Petition Date"), an involuntary petition was filed against the Debtor seeking relief under chapter 7 of title 11 of the U.S. Code (the "Bankruptcy Code") [Dkt. No. 1].

14.     On February 9, 2023, the Court granted the petition and entered an order for relief under chapter 7 of the Bankruptcy Code [Dkt. No. 7].

15.     On February 10, 2023, the Court appointed the Trustee as the chapter 7 trustee for the Debtor and its estate (the "Estate") [Dkt. No. 8].

16.     On April 5, 2023, the Court entered an order [Docket No. 30] authorizing the Trustee to employ Bederson, LLP ("Bederson") as her accountants in the bankruptcy case.

17.     On July 19, 2024, the Court entered an order authorizing the Trustee to employ Banks and Banks and Weidman Law LLC as Special Litigation Counsel [Dkt. No. 50].

## **FACTUAL BACKGROUND**

*A.*      *The Debtor*

18.      Avrio was founded by Brandon Hensinger ("Hensinger") in 2019 as a fertility testing services provider.

19.      After the onset of the COVID-19 pandemic, Avrio shifted its business from fertility testing to the sale of COVID-19 testing, initially selling antibody tests for use by testing sites and medical providers, and later, when the demand for home test kits dramatically increased with the spread of the Omicron variant in late 2021, selling antigen home test kits for use by the general public.

20.      At or about the time that Avrio began selling COVID-19 testing, Strader formed Boca, a single-member limited liability company, and Boca became a 50% owner of Avrio.

21.      At or about the time that Boca became a member of Avrio, Hensinger transferred his ownership interest in Avrio into the Brandon Hensinger 2020 Trust, an entity that Hensinger controlled (the "Hensinger Trust").

22.      Strader, Boca, Hensinger and the Hensinger Trust are all insiders of Avrio within the meaning of 11 U.S.C. § 101(31)(B) (collectively, the "Insiders").

23.      After Boca became a member of Avrio, Hensinger served as Avrio's Chief Executive Officer and Strader as its President and Treasurer, with both men serving as the managers of the company.

*B.*      *Avrio's Insolvency*

24.      Prior to the filing of this Complaint, Bederson conducted an investigation of Avrio's finances and financial affairs.

4

25.     In connection with this investigation, Bederson reviewed, among other things: (i) Avrio's 2020 and 2021 Federal income tax returns prepared by Jonathan Convery LLC, Avrio's prior accountant; (ii) Avrio's 2022 Federal income tax return, which Bederson prepared using Avrio's books and records; (iii) various reports and postings in Avrio's QuickBooks Online accounting software service, including general ledger detail reports, balance sheets, income statements, accounts receivable and accounts payable aging reports, inventory transaction histories, and adjusting journal entries; (iv) bank records subpoenaed from Avrio's financial institutions, including Bank of America, Key Bank and Wells Fargo; (v) analyses provided by Hensinger of Avrio's bank statement transactions along with deposits and refunds that were paid to customers; (vi) correspondence that the Trustee's counsel received from various customers in response to A/R collection demands; (vii) proofs of claim filed by creditors, as obtained from the claims register in Avrio's case; (viii) meetings, calls and correspondence with the Trustee and her counsel; and (ix) meetings, calls and correspondence with Hensinger.

26.     As part of that investigation, Bederson has determined that certain "transfers" made by Avrio to Strader, Boca, the other Insiders, and various third parties were not made in furtherance of Avrio's business operations.

27.     Rather, as detailed more fully below, these "transfers" were made either to or for the benefit of Strader, Boca, the other Insiders, and/or business entities owned or operated by Strader.

28.     As part of its work, Bederson also conducted an insolvency analysis of Avrio for the years 2020 through the Petition Date.

29.     Based upon its analysis of the information available to the Trustee and her professionals, Bederson determined that Avrio was insolvent on a balance sheet basis from August 31, 2020 through December 31, 2022.

30.     Since Avrio ceased operations during 2022 and had no 2023 activity (other than bank fees), Bederson determined that Avrio continued to be insolvent through the Petition Date.

31.     In particular, on August 31, 2020, Avrio's liabilities exceeded its assets by approximately $760,914.  In addition, Avrio's insolvency increased in the following months and years.  By December 31, 2020, Avrio's liabilities exceeded its assets by approximately $861,643. That figure increased to approximately $2,176,441 by December 31, 2021, and to approximately $6,714,454 by December 31, 2022.

32.     During this same time period, Avrio also incurred debts beyond its capacity to pay as they came due.  For instance, Avrio's corrected and adjusted accounts payable were approximately $916,859 as of August 31, 2020, and grew to approximately $3,343.494 by December 31, 2022.  Avrio's total liabilities during this same time period increased from approximately $968,356 to $6,714,454.

33.     Moreover, Avrio's accounts payable records and claims register reflect that multiple of Avrio's vendors had outstanding balances that were never completely paid off during this timeframe (i.e., August of 2020 through the Petition Date).

34.     In addition to these unpaid claims, Bederson also determined that Avrio had additional debt, such as a $50,000 PPP Loan it received in May 2020, that it did not have to pay back, and most likely would not have had the ability to pay back had the loan not been forgiven.

35.     In addition, Avrio's records indicate that it refunded approximately $7.9 million to customers in 2022, and another $270,000 to customers in 2021.

36.     Furthermore, and as detailed more fully below, proofs of claim filed in this case indicate that there were at least four customers who gave Avrio deposits that Avrio ultimately was unable to repay, including a deposit in the amount of $3,087,920 that Merrow Manufacturing LLC ("Merrow") asserts is owed to it (Claim 5-1); a deposit in the amount of $264,600 that SafeCamp LLC ("SafeCamp") asserts is owed to it (Claim 9-1); a deposit in the amount of $1,474,200 that Global Supply Exchange ("Global Supply") asserts has only partially been refunded prior to the Petition Date, with $300,000 claimed to be still owed (Claim 8-1); and a deposit in the amount of $337,500.00 that Sunline Office LLC ("Sunline") asserts was only partially refunded, and for which it is seeking $308,975.00 (Claim 10-1).

37.     Avrio's inability to meet or fulfill its customers' orders is also an indication that it could not meet its fiscal obligations and was having difficulty paying its debts as they became due and owing.

38.     In point of fact, as of December 31, 2020, Avrio's actual annual adjusted losses were approximately $657,490.  That figure grew to $1,163,923 as of December 31, 2021 and to $3,567,008 as of December 31, 2022.

39.     Avrio's increasing liabilities, losses, and inability to meet customer obligations all demonstrate that Avrio could not pay its debts as they came due during the time period referenced above.

40.     Avrio also had unreasonably small capital during all relevant time periods.  In particular, since Avrio was balance sheet insolvent from August 31, 2020 through the Petition Date, Avrio clearly had unreasonably small capital.

41.     Avrio had consistent losses and never turned a profit in any year from 2020 through the Petition Date.

42.     Moreover, Avrio's liabilities trended higher over that time because it appeared, based upon the information and documents Bederson reviewed, to be using ever-increasing accounts payable to fund operations.

**C.     The Defendants' Self-Dealing**

43.     Avrio's insolvency and losses resulted directly from the Defendants' self-dealing and breaches of their fiduciary duties to the company.

44.     As a manager, President and Treasurer of Avrio, Strader owed fiduciary duties to the company.

45.     As a 50% owner of Avrio, Boca likewise owed fiduciary duties to the company.

46.     These fiduciaries duties required the Defendants to discharge their responsibilities to Avrio in good faith, in a manner they reasonably believed to be in the best interest of the company, and with such care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances.

47.     Although Avrio was ostensibly engaged in legitimate businesses for most of its existence, the Defendants repeatedly breached their fiduciary duties to the company, treating it as their "personal piggybanks" and lining their own pockets at the expense of the company, its customers and other creditors.

48.     For example, (i) Strader paid himself excessive salary that bore no relation to the services he rendered to the company; (ii) Strader caused Avrio to make excessive distributions to himself and Boca that made it difficult or impossible for Avrio to meet its financial obligations; (iii) Strader made exorbitant purchases that enriched himself personally but had no legitimate business purposes; and (iv) Strader caused Avrio to make payments for his own benefit to

relatives, business associates and other third parties connected to him, none of whom performed

services for Avrio (all, collectively, "Strader Affiliates").

49.     In a span of less than two years, from June 2020 when Strader became an owner

through Boca, until Avrio ceased operations in or about the spring of 2022, Strader caused Avrio

to pay $758,753 to himself, $450,000 to Boca, and $691,788 to Strader Affiliates.  Schedules of

the payments to Strader and Boca are attached hereto as Exhibits A and B, respectively.

50.     The Defendants' self-dealing and misappropriations of Avrio's money, assets and

opportunities caused Avrio to become insolvent, suffer operating losses, experience deepening

insolvency and increasing losses, and ultimately be forced into bankruptcy.

51.     The Defendants provided little to no services or consideration for the money that

Strader caused Avrio to pay them, and all such payments were made while Avrio was insolvent.

52.     Likewise, the payments that Strader caused Avrio to pay the Strader Affiliates

were not for legitimate expenses of Avrio but, in reality, were made for the benefit of Strader

and/or his non-Avrio business interests.  Nearly all such payments were made while Avrio was

insolvent.

53.     These improper conveyances to Strader Affiliates included, for example:

    a.  payments to a firm called 3B Consulting ($135,000) and George Buckler, the

        owner of the firm ($24,567), both of whom performed no services for Avrio

        and instead performed services for Strader or for other businesses in which he

        had an interest;

    b.  payments to a firm called Med Management ($259,172) and its owner, Duke

        Zukowski ($10,000), both of whom performed no services for Avrio and

instead performed services for Strader or for other businesses in which he had an interest;

c. payments to Strader's son, Jonathan Strader ($91,311), who performed no services for Avrio, but for whom, on information and belief, Strader prepared falsified invoices indicating that his son had incurred expenses on behalf of Avrio;

d. payments to a firm called Mining Land and Trust ($28,100) for creating patent portfolios on behalf of Strader personally;

e. payments to a firm called Pugliese Associates ($40,573), a lobbying group that worked for Strader to help him secure a position as a board advisor having no relationship to Avrio's business.

54. Strader also directed Hensinger to place certain Strader Affiliates on Avrio's payroll even though they performed no services for Avrio, at a total cost to Avrio of at least $61,637. Such persons included, for example, Margaret Schindler, who was paid $12,540.29; Nicol Worrell, who was paid $12,916.25; John Deese, who was paid $20,000; and Kyle Hooper, who was paid $3,500.

55. Strader also usurped and converted to his own benefit a laboratory and lab equipment in Houston, Texas called IXI Wellness, for which Avrio incurred costs totaling $282,562 for the ostensible purpose of providing COVID-19 testing services. Strader took over the lab's operations, used it for non-Avrio purposes, put Strader Affiliates on the lab's (Avrio's) payroll who performed no services for Avrio, and ultimately sold off the lab's equipment to a third party, keeping the proceeds for himself.

56.     Hensinger facilitated and acceded to Strader's wrongdoing, and in so doing, breached his own obligations to Avrio.  According to Hensinger, Strader threatened Hensinger with physical violence if he did not do as Strader requested.

57.     Hensinger also breached his fiduciary duties to Avrio in his own right by misappropriating and fraudulently conveying corporate assets to himself and the Hensinger Trust, often doing so at the direction or urging of Strader.

**D.      The Test Kit Scheme**

58.     When Avrio began selling COVID-19 home test kits in late 2021, Strader discovered a new and even more lucrative way to enrich himself and the other Insiders at the expense of the company, its customers and other creditors.

59.     Instead of purchasing and maintaining an inventory of test kits that it subsequently sold and delivered to its customers, Avrio, under the control of Strader and the other Insiders, required its customers to prepay for test kits, and then purportedly used this money to obtain the kits ordered by the customers.

60.     The amounts that customers prepaid Avrio for test kits were sometimes in the range of $1 million to $3 million per order.

61.     Until Avrio completed a customer's order by obtaining and delivering the test kits from a supplier, the amount paid by the customer was a *liability* – a sum that Avrio owed to the customer – not sales revenue.

62.     As Bederson determined, and as Strader, on information and belief, was aware, Avrio often recorded such customer deposits in its accounting records not as liabilities, but as revenue, causing the company's liabilities to be understated and its revenues to be overstated.

63.     While Strader and the other Insiders used some customer deposits to purchase and deliver test kits, they often did not do so, instead diverting deposit money to themselves and/or the Strader Affiliates.

64.     By diverting customer deposits, Strader and the other Insiders depleted Avrio's capital accounts, caused operating losses, and deepened the company's insolvency.

65.     In order to keep Avrio afloat and allow them to continue diverting customer deposits to their own benefit, Strader and the other Insiders used funds from prepayments on new orders to make refunds or to purchase test kits on old orders.

66.     In the period from December 14, 2021 to January 24, 2022, Avrio received and refunded deposits from several customers totaling $1,658,778.00.

67.     Avrio on occasion received refunds for test kits that Avrio had paid for but not received.  When this occurred, Strader and the other Insiders distributed those funds to themselves and/or Strader Affiliates rather than either applying those funds to the purchase of product to satisfy Avrio's outstanding customer orders, or refunding those monies to customers.

68.     As of mid-January 2022, Avrio had no reliable source of supply for test kits, after being discontinued as a distributor by Access Bio, the manufacturer of CareStart tests.

69.     Nevertheless, at Strader's urging and direction, Avrio continued to solicit orders and accept large prepayments even though it had no viable way to complete the transactions.

70.     In this way, in the early 2022 time period, Strader and the other Insiders were operating what was tantamount to a Ponzi scheme:  accepting orders and deposits knowing that they could not feasibly obtain the test kits; diverting substantial amounts of the deposits to themselves or the Strader Affiliates; and using money from new orders and deposits to refund prepayments when customers with old orders demanded them.

12

### E.    *Merrow Manufacturing LLC*

71.    In or about January 2022, Avrio was introduced to Merrow, a new customer.

72.    Merrow, a family-owned company dating back to the 1800s, played an important role in promoting public health throughout the COVID-19 pandemic.

73.    Merrow's core business was manufacturing garments and other soft goods.

74.    When medical supplies became scarce after the onset of the pandemic, Merrow began manufacturing medical gowns for the United States Veterans Administration, the Commonwealth of Massachusetts, and other government bodies and health care providers.

75.    In 2021, Merrow began selling COVID-19 test kits to customers such as the Massachusetts Department of Education and the State of Rhode Island.

76.    In order to obtain test kits for one such customer, Merrow ordered a total of 399,040 CareStart test kits from Avrio between January 14 and 19, 2022.  The purchase price for the kits was $3,087,920, which Merrow prepaid in full by three wire transfers on January 18 and 19, 2022.

77.    Strader knew that when Avrio accepted these orders and prepayments from Merrow, Avrio had no CareStart tests in its possession and was unable to obtain such tests from the manufacturer, AccessBio.

78.    Strader had no intention of completing the orders by Merrow.  Instead, he diverted the Merrow deposit to the benefit of himself and the other Insiders.

79.    On January 20, 2022, the day after Merrow completed its three wire transfers, Strader caused Avrio to make a distribution to himself personally in the amount of $619,463.

80.    Between January 24, 2022 and February 10, 2022, Strader caused Avrio to make additional payments to himself totaling $40,000.

81.      On January 28, 2022, Strader caused Avrio to make a payment to Boca of $150,000.

82.      On February 7, 2022, Strader caused Avrio to make a payment to Boca in the amount of $250,000.

83.      As Strader also knew and directed, Avrio distributed a total of $816,991 to Hensinger and the Hensinger Trust between January 20 and February 10, 2022.

84.      All of these January/February 2022 distributions were made using Merrow's deposit money, at a time when Avrio was insolvent, and with Strader and the other Insiders having provided no corresponding services or consideration to Avrio.

85.      Strader, on information and belief, used some or all of the money that he and Boca misappropriated from Avrio during the January/February 2022 time period to purchase a condominium in Nashville, Tennessee with a purchase price of over $1 million.

86.      When Avrio failed to deliver the test kits that Merrow ordered, Charles Merrow, the company's Chief Executive Officer, contacted Hensinger, expressed concern about the unfulfilled order, and said that he was contemplating demanding a refund.  At Strader's urging, Hensinger falsely assured Mr. Merrow that Avrio would be able to complete the order.

87.      At the time, Avrio could not have refunded Merrow in full, with Strader and the other Insiders having already diverted more than $1 million of Merrow's deposit money to themselves.  If Strader was going to keep Avrio afloat – and continue to solicit new orders, obtain additional prepayments, and line the Insiders' pockets – he needed a way to mollify Mr. Merrow and other customers.

F.    *The Fraudulent Reference Letter*

88.    The way that Strader devised to address this "need" was to obtain a reference letter from Wells Fargo, N.A. ("Wells Fargo"), where Avrio banked, and to use that letter to solicit new orders and to persuade Merrow and other customers not to demand refunds.

89.    At the time, Strader and a business associate, Blake Byram ("Byram"), were considering a real estate investment together, and Strader learned that Byram was a client of a Senior Portfolio Manager in Wells Fargo's Private Bank Division, James M. Brown ("Brown").

90.    On January 25, 2022, Byram and Strader called Brown to ask if Brown could refer them to someone at Wells Fargo who might be able to assist with a loan for their potential real estate venture.  Brown said he would do so.

91.    Shortly after the call, Strader sent Brown an unsolicited text saying that he had a matter to discuss that was unrelated to the call.

92.    Strader said in the text that he had recently obtained a controlling interest in Avrio, that Avrio banked at Wells Fargo, that "we expect to move a few hundred million dollars in FDA EUA Authorized testing to large companies and government entities," and that "[i]t would be helpful to have a bank reference letter saying how long Avrio has been a client and is in good standing with the bank."

93.    Strader asked if Brown could point him to someone at the bank who could help, adding, "If so, we will keep funds in Wells Fargo ongoing."

94.    Two days later, Brown e-mailed a letter to Strader with the subject line "Reference Letter" (the "Reference Letter").

95.    The Reference Letter was signed by Brown, was on his "The Private Bank" letterhead, and described Avrio as "our client."  As Strader was well aware, Avrio was not a

client of Brown's or of anyone else's in the Private Bank Division of Wells Fargo, and Avrio could not have been such a client given Wells Fargo's Private Bank requirements.

96.    The Reference Letter, which was addressed "To Whom it May Concern," stated that Avrio had been a client "since 2008."  As Strader knew, this too was false because Avrio did not open its accounts, or even exist, until 2019.

97.    The Reference Letter stated that Avrio was in "good standing," but, as Strader further knew or should have known, Avrio was not in good standing, having had multiple daily and monthly negative closing balances with associated charges for overdrafts in the year prior to the issuance of the letter.

98.    The Reference Letter also stated that Avrio "has significant revenues in excess of expenses," that it "has the strong ability to complete any and all financial related matters with their customers," and that it "is ready, willing and able to perform on any contract which they may deem of interest."

99.    As Strader knew, all of these statements were false.  Avrio had been insolvent for nearly the entire time that Strader had been involved with the company.  Avrio did not have significant revenues in excess of expenses; to the contrary, the company was consistently losing money.  And Avrio was unable to complete orders or perform on contracts because, among other reasons, it had no source of supply for test kits as of the date of the letter.

100.    Although Strader knew that all of these statements in the Reference Letter were false, he forwarded the letter to Hensinger and directed him to use it to solicit new orders and to persuade Merrow and other customers not to demand refunds.

101.    Strader told Hensinger that when Hensinger sends the Reference Letter to third parties, he should forward the e-mail from Brown to show that the letter was authentic.

102.    Strader also told Hensinger in a text message: "You see it [the Reference Letter] came from the Private Bank. You have to have a min of 5 million to even bank there."

103.    As soon as Hensinger received the Reference Letter, he did as Strader instructed and forwarded it to Mr. Merrow. When Mr. Merrow reviewed the letter, he was reassured, believing, in reliance on the letter, that Avrio was a Private Bank client of Brown's, had been so since 2008, was in strong financial health, and would be able to complete Merrow's test kit orders.

104.    In reliance on the Reference Letter, Merrow decided not to demand a refund of the more than $3 million that Merrow had prepaid.

105.    Merrow's decision kept Avrio in business for the next several months, which in turn allowed Strader and the other Insiders to continue soliciting, receiving, and diverting to themselves prepayments from unsuspecting customers.

106.    These unsuspecting customers included SafeCamp, which prepaid $264,600 on January 28, 2022 for test kits that Avrio had no ability to deliver. None of this money was ever refunded, and SafeCamp, as noted above, has filed a proof of claim for this amount in the bankruptcy proceeding (Claim 9-1).

107.    Likewise, Global Supply prepaid $1,474,200 on February 8, 2022 for test kits that Avrio had no viable way to deliver. Although Avrio ultimately refunded $1,080,000 of this money, the customer asserts in its proof of claim that it is owed $300,000 (Claim 8-1).

108.    In addition to keeping Merrow at bay, Strader and the other Insiders, on information and belief, used the Reference Letter to solicit other orders that Avrio had no ability to fill, and to persuade other customers not to demand refunds of their prepayments when test kits were not delivered on time.

17

109.    For example, on or about January 21, 2022, Sunline prepaid $337,500 to Avrio for 200,000 Flow Flex test kits.  On information and belief, Avrio, at Strader's direction, used the Reference Letter to persuade Sunline not to demand a refund when the test kits were not delivered on time.  Eventually Avrio refunded a portion of Sunline's deposit, but Sunline asserts in its proof of claim that it is owed $308,974.76 (Claim 10-1).

110.    In the period after the Reference Letter was used to persuade Merrow not to demand an immediate refund, Strader diverted deposit monies of Merrow and other customers to pay himself an additional $55,000 and Boca an additional $400,000.

111.    As Strader was aware, on or about March 9, 2022, Hensinger admitted to Mr. Merrow that Avrio did not have the test kits Merrow had ordered, and that Avrio no longer had, and could not return, Merrow's deposit money.

112.    Even after this conversation, Strader instructed Hensinger to use monies from a purported sale of iHealth test kits to pay for Strader's purchase of real property in Cabo, San Lucas, Mexico, instead of using those funds to refund Merrow or satisfy other Avrio payment obligations.

113.    As a result of the Defendants' misconduct, Avrio was forced to cease operations.

114.    On January 13, 2023, Merrow filed an involuntary petition against Avrio, commencing this chapter 7 bankruptcy proceeding.

115.    Avrio's creditors have filed proofs of claim totaling more than $4.75 million.

116.    The Defendants' misconduct as alleged in this Complaint was willful, wanton and outrageous.

## CLAIMS FOR RELIEF

### Count One

### Breach of Fiduciary Duty

117.    Plaintiff repeats and incorporates by reference all of the foregoing allegations.

118.    As a manager and officer of Avrio, Strader owed fiduciary duties to Avrio.

119.    As a 50% owner of Avrio, Boca owed fiduciary duties to Avrio.

120.    These fiduciary duties required Strader and Boca to discharge their responsibilities to Avrio in good faith, in a manner they reasonably believed to be in the best interest of the company, and with such care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances.

121.    Once Avrio became insolvent, the Defendants owed a fiduciary duty to the company's creditors. *Voest-Alpine Trading USA v. Vantage Steel Corp.*, 919 F.2d 206, 217 n. 25 (3rd Cir. 1990).

122.    The Defendants breached their fiduciary duties to Avrio by misappropriating, wasting and fraudulently conveying corporate assets and opportunities to themselves and the Strader Affiliates, by defrauding customers, and by misappropriating customer deposits, among other misconduct.

123.    As a direct and proximate result of the Defendants' breaches of fiduciary duties, Avrio suffered significant injuries, including, without limitation, the loss of money and assets that the Defendants misappropriated to themselves and the Strader Affiliates, being rendered insolvent, suffering operating losses, experiencing deepening insolvency and losses, having to cease operations, and being forced into bankruptcy with more than $4.75 million claimed by its creditors.

## Count Two

## Conversion

124.    Plaintiff repeats and incorporates by reference all of the foregoing allegations.

125.    The Defendants converted, misappropriated and defalcated Avrio's money and other assets to themselves and the Strader Affiliates for no consideration, with the lion's share of such misconduct occurring while Avrio was insolvent.

126.    As a direct and proximate result, Avrio suffered significant injuries, including, without limitation, the loss of money and other assets that the Defendants misappropriated to themselves and the Strader Affiliates, being rendered insolvent, suffering operating losses, experiencing deepening insolvency and losses, having to cease operations, and being forced into bankruptcy with more than $4.75 million claimed by its creditors.

## Count Three

## Corporate Waste

127.    Plaintiff repeats and incorporates by reference all of the foregoing allegations.

128.    The Defendants violated their duties to Avrio and engaged in corporate waste by, among other misconduct, wasting, misappropriating, and fraudulently conveying corporate assets and opportunities and customer deposits.

129.    As a direct and proximate result, Avrio suffered significant injuries, including, without limitation, the loss of money and assets that the Defendants misappropriated to themselves and the Strader Affiliates, being rendered insolvent, suffering operating losses, experiencing deepening insolvency and losses, having to cease operations, and being forced into bankruptcy with more than $4.75 million claimed by its creditors.

## Count Four

## Avoidance of Transfers Under 12 Pa.C.S. § 5104(a)(1) and 11 U.S.C. § 544(b)

130.    Plaintiff repeats and incorporates by reference all of the foregoing allegations.

131.    Between June 2020, when Strader became an owner through Boca, until Avrio ceased operations in or about the spring of 2022, the Defendants caused Avrio to pay $758,753 to Strader ("Strader Transfers") and $450,000 to Boca ("Boca Transfers").

132.    All of the Strader Transfers and Boca Transfers were made by or on behalf of Avrio and came from an account or accounts owned solely by Avrio.

133.    Thus, each of the Strader Transfers and Boca Transfers constituted a transfer of Avrio's interest in property.

134.    At the time that each of the Strader Transfers and Boca Transfers was made, Avrio was insolvent (either because its assets were exceeded by its liabilities or because it was not paying its debts as they became due) and had at least one creditor.

135.    Since at least August 31, 2020, the total of Avrio's debt has been, and continues to be, greater than its available assets, and since at least that date, Avrio has been unable to pay its debts as they became due and owing.

136.    As a result, each time a Strader Transfer or Boca Transfer occurred, Avrio was rendered even more insolvent by virtue of that Transfer.

137.    The Strader Transfers and Boca Transfers were made solely to benefit Strader and Boca.

138.     At no point in time did any of the Strader Transfers or Boca Transfers benefit Avrio.

139.    Each Strader Transfer and Boca Transfer constituted a "transfer" within the meaning of the Pennsylvania Uniform Voidable Transactions Act ("UVTA") and the Bankruptcy Code.

140.    Since the Strader Transfers and Boca Transfers were made not for a legitimate business purpose for Avrio, the Strader Transfers and Boca Transfers were made with actual intent to hinder, delay, or defraud any entity to which Avrio was or became, on or after the date that such transfer was made or such obligation incurred, indebted.

141.    At the time the Strader Transfers and Boca Transfers were made, the Defendants were aware or should have been aware of the millions of dollars in unpaid liabilities that Avrio faced.

142.    Instead of satisfying or honoring any of those obligations, the Defendants caused Avrio to make the Strader Transfers and Boca Transfers, with Avrio receiving no benefit in return.

143.    Furthermore, each of the Strader Transfers and Boca Transfers placed assets of Avrio out of reach of legitimate creditors with claims for unpaid services and goods that were actually provided to the Avrio, and ultimately operated to extinguish any possibility of those creditors being made whole.

144.    Accordingly, the Strader Transfers and Boca Transfers constitute avoidable fraudulent transfers pursuant to 12 Pa.C.S. § 5104(a)(1) and Bankruptcy Code § 544(b) and, as such, they are recoverable from Strader and Boca pursuant to Bankruptcy Code § 550(a).

145.    The Defendants have failed to return any of the Strader Transfers or Boca Transfers to the Trustee.

## Count Five

## Avoidance of Transfers Under 12 Pa.C.S. § 5104(a)(2) and 11 U.S.C. § 544(b)

146.    Plaintiff repeats and incorporates by reference all of the foregoing allegations.

147.    Between June 2020, when Strader became an owner through Boca, until Avrio ceased operations in or about the spring of 2022, the Defendants caused Avrio to make the Strader Transfers and Boca Transfers.

148.    All of the Strader Transfers and Boca Transfers were made by or on behalf of Avrio, and came from an account or accounts owned by Avrio.

149.    Thus, each of the Strader Transfers and Boca Transfers constituted a transfer of Avrio's interest in property.

150.    At the time of each of the Strader Transfers and Boca Transfers, Avrio was insolvent and had at least one creditor.

151.    Since at least August 31, 2020, the total of Avrio's debt has been, and continues to be, greater than its available assets, and since at least the same date, Avrio has been unable to pay its debts as they became due and owing.

152.    As a result, each time a Strader Transfer or Boca Transfer occurred, Avrio was rendered even more insolvent by virtue of that transfer.

153.    The Strader Transfers and Boca Transfers were made solely to the benefit of the Defendants.  At no point in time did any of the Strader Transfers or Boca Transfers benefit Avrio.

154.    Each Strader Transfer and Boca Transfer constitutes a "transfer" within the meaning of UVTA and the Bankruptcy Code.

155.    Further, Avrio received no reasonably equivalent value in exchange for the Strader Transfers and Boca Transfers.

156.    Avrio made the Strader Transfers and Boca Transfers, and the Defendants provided no services or other consideration to Arvio in return for the Strader Transfers and Boca Transfers.  Rather, each of the Strader Transfers and Boca Transfers was made solely for the benefit of the Defendants.

157.    Accordingly, the Strader Transfers and Boca Transfers constitute avoidable fraudulent transfers pursuant to 12 Pa.C.S. § 5104(a)(2) and Bankruptcy Code § 544(b) and, as such, they are recoverable from Strader and Boca pursuant to Bankruptcy Code § 550(a).

158.    The Defendants have failed to return any of the Strader Transfers or Boca Transfers to the Trustee.

## Count Six

## Avoidance of Transfers Under 12 Pa.C.S. § 5105 and 11 U.S.C. § 544(a)

159.    Plaintiff repeats and incorporates by reference all of the foregoing allegations.

160.    Each of the Strader Transfers and Boca Transfers was a transfer of property of Avrio made to Strader or Boca within the four (4) year period immediately preceding the Petition Date, and each such Transfer constitutes a "transfer" within the meaning of the UVTA and the Bankruptcy Code.

161.    As set forth above, all of the Strader Transfers and Boca Transfers were made by or on behalf of Avrio and came from an account or accounts owned by Avrio.

162.    Thus, each of the Strader Transfers and Boca Transfers constituted a transfer of Avrio's interest in property.

163.    Avrio was insolvent and had at least one creditor at the time each of the Strader Transfers and Boca Transfers was made.

164.    Since at least August 31, 2020, the total of Avrio's liabilities has been, and continues to be, greater than its available assets, and since at least the same date, Avrio has been unable to pay its debts as they became due and owing.

165.    For the reasons set forth herein, in exchange for each of the Strader Transfers and Boca Transfers, Avrio received no reasonably equivalent value.

166.    The Strader Transfers and Boca Transfers were made solely to benefit the Defendants.

167.    At no point in time did any of the Strader Transfers or Boca Transfers benefit Avrio.

168.    Accordingly, the Strader Transfers and Boca Transfers constitute avoidable fraudulent transfers pursuant to 12 Pa. C.S. § 5105, and Bankruptcy Code § 544(a) and, as such, they are recoverable from the Defendants pursuant to Bankruptcy Code § 550(a).

169.    The Defendants have failed to return any of the Strader Transfers or Boca Transfers to the Trustee.

## **Count Seven**

### **Recovery of Transfers Under 11 U.S.C. § 550**

170.    Plaintiff repeats and incorporates by reference all of the foregoing allegations.

171.    The Trustee is entitled to avoid the Strader Transfers and Boca Transfers pursuant to 11 U.S.C. §§ 544.

172.    Strader received $758,753 of the Strader Transfers directly.  Thus, Strader was the initial transferee of each Strader Transfer, and is liable for the return of such Strader Transfers (or the amount thereof).

173.     Boca received $450,000 of the Boca Transfers directly.  Thus, Boca was the initial transferee of each such Boca Transfer, and is liable for the return of such Boca Transfers (or the amount thereof).

174.     Pursuant to Bankruptcy Code § 550(a), the Trustee is entitled to recover the Strader Transfers from Strader and the Boca Transfers from Boca, or the amounts thereof, plus interest thereon to the date of payment as well as costs of this action.

## Count Eight

### Avoidance of Transfers Under 11 U.S.C. § 548(a)(1)(A)

175.     Plaintiff repeats and incorporates by reference all of the foregoing allegations.

176.     Each payment made by Avrio to Defendants was a "transfer" within the definition of 11 U.S.C. § 101(54)(D)(i) or (ii).

177.     All but two of the Strader Transfers (specifically, the payment of $1,105.90 to Strader on December 10, 2020 and the payment of $3,054.48 to Strader on December 23, 2020) were made within two years before the Petition Date.  The balance of the Strader Transfers were made within two years before the Petition Date, and are collectively referred to as the "Strader 548 Transfers" or, each individually, a "Strader 548 Transfer".

178.     All of the Boca Transfers were made within two years before the Petition Date.

179.     Each of the Strader 548 Transfers and Boca Transfers was a transfer of property, or of an interest in property, of Avrio to the applicable Defendant.

180.     As set forth herein, in exchange for each of the Strader 548 Transfers and Boca Transfers, the Debtor received no reasonably equivalent value.

181.     Each of the Strader 548 Transfers and Boca Transfers was made with actual intent to hinder, delay, or defraud any entity to which Avrio was or became, on or after the date that such transfer was made or such obligation incurred, indebted.

182.    At the time each Strader 548 Transfer and Boca Transfer was made, the

Defendants were aware or should have been aware of the significant unpaid liabilities that Avrio

faced.

183.    Instead of satisfying or honoring any of those obligations, the Defendants caused

Avrio to make the Strader 548 Transfers and Boca Transfers solely to benefit the Defendants.

184.    Each Strader 548 Transfer and Boca Transfer therefore placed assets of Avrio out

of reach of legitimate creditors with claims for unpaid services and goods provided to Avrio and

ultimately operated to extinguish any possibility of those creditors being made whole.

185.    The Strader 548 Transfers and Boca Transfers constitute avoidable fraudulent

transfers pursuant to Bankruptcy Code § 548(a)(1)(A) and, as such, they are recoverable from the

Defendants pursuant to Bankruptcy Code § 550(a).

186.    The Defendants have not returned the Strader 548 Transfers or Boca Transfers (or

the monetary equivalent thereof) to the Trustee.

## Count Nine

### Avoidance of Transfers under 11 U.S.C. § 548(a)(1)(B)

187.    Plaintiff repeats and incorporates by reference all of the foregoing allegations.

188.    Each payment made by Avrio to Defendants was a "transfer" within the definition

of 11 U.S.C. § 101(54)(D)(i) or (ii).

189.    Each of the Strader 548 Transfers and Boca Transfers was a transfer of property,

or of an interest in property, of the Debtor to the applicable Defendant.

190.    As set forth herein, in exchange for each of the Strader 548 Transfers and Boca

Transfers, Avrio received no reasonably equivalent value.

191.    In addition, and as explained above, at the time each of the Strader 548 Transfers and Boca Transfers was made, Avrio: (a) was insolvent or became insolvent as a result of the Strader 548 Transfer; (b) had unreasonably small capital; or (c) intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

192.    Accordingly, the Strader 548 Transfers and Boca Transfers constitute avoidable fraudulent transfers pursuant to Bankruptcy Code § 548(a)(1)(B) and, as such, they are recoverable from the applicable Defendant pursuant to Bankruptcy Code §550(a).

193.    The Defendants have not returned the Strader 548 Transfers and Boca Transfers (or the monetary equivalent thereof) to the Trustee.

## Count Ten

## Unjust Enrichment

194.    Plaintiff repeats and incorporates by reference all of the foregoing allegations.

195.    As set forth herein, the Strader Transfers and Boca Transfers, which were made by Avrio to the Defendants, were made for the benefit of the Defendants, and Avrio received no reasonably equivalent value for the Strader Transfers or Boca Transfers.

196.    Avrio conferred significant monetary benefits upon the Defendants at Avrio's expense by making the Strader Transfers and Boca Transfers.

197.    The Defendants were aware of, and had knowledge of, the benefits conferred upon them by Avrio though the Strader Transfers and Boca Transfers.

198.    Under these circumstances, it would be unjust and inequitable to permit the Defendants to retain the value of the Strader Transfers and Boca Transfers, the benefits of which the Defendants wrongfully received without providing reasonably equivalent value and/or sufficient consideration therefor.

199.    As the Defendants were unjustly enriched by the Strader Transfers and Boca Transfers made by Avrio, the Trustee is therefore entitled to disgorgement and restitution of the full amount and/or value of the Strader Transfers and Boca Transfers, which Avrio made for the sole benefit of the Defendants, and for which the Defendants provided no reasonably equivalent value and/or consideration.

## Count Eleven

### Disallowance of all Claims Under 11 U.S.C § 502(d) and (j)

200.    Plaintiff repeats and incorporates by reference all of the foregoing allegations.

201.    The Defendants are the transferees of the Strader Transfers and Boca Transfers, which are avoidable under sections 547 and/or 548 of the Bankruptcy Code, and which are recoverable under section 550 of the Bankruptcy Code.

202.    The Defendants have not paid the amount of the Strader Transfers or Boca Transfers, or turned over such property, for which the Defendants are liable under section 550 of the Bankruptcy Code.

203.    Pursuant to section 502(d) of the Bankruptcy Code, any and all claims of Strader and Boca against Avrio must be disallowed until such time as Strader pays the Trustee an amount equal to the Strader Transfers and Boca pays the Trustee an amount equal to the Boca Transfers.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiff demands judgment in her favor and against the Defendants, jointly and severally, for the following relief:

(a)    On Counts One, Two and Three, damages consisting of and including, without limitation, all amounts that Avrio owes its creditors, all amounts that the Defendants conveyed to themselves in the Strader Transfers and Boca Transfers,

all amounts that the Defendants caused Avrio to convey to the Strader Affiliates, and all other losses suffered by Avrio;

(b)    On Counts Four, Five and Six, an order avoiding the Strader Transfers and Boca Transfers, or the value thereof;

(c)    On Count Seven, an order directing Strader to return the Strader Transfers and Boca to return the Boca Transfers pursuant to Bankruptcy Code §§ 544, 548, and 550(a);

(d)    On Counts Eight and Nine, an order avoiding the Strader 548 Transfers and Boca Transfers, or the value thereof;

(e)    On Count Ten, an order awarding appropriate restoration to the Trustee from the Defendants for their unjust enrichment;

(f)    On Count Eleven, an order denying each Defendant's proof of claim;

(g)    Attorney's fees and litigation expenses in connection with the commencement and prosecution of these claims;

(h)    Pre-petition and post-petition interest on the amounts owed by the Defendants to the full extent allowable under applicable law;

(i)    Costs;

(j)    Punitive damages as legally permissible; and

(k)      Such additional relief as the Court deems just.


                                    **WEIDMAN LAW, LLC**

                                    **s/Peter J. Weidman**
                                    **Peter J. Weidman**
                                    **PA Atty ID No. 43735**
                                    **600 West Germantown Pike, Suite 400**
                                    **Plymouth Meeting, PA 19462**
                                    **610-940-1686**
                                    **pweidman@weidmanlaw.com**

                                    **Banks & Banks**
                                    **David Banks**
                                    **PA Atty ID No. 57018**
                                    **3038 Church Road**
                                    **Lafayette Hill, PA 19444**
                                    **610-940-1686**
                                    **bbwlaw@yahoo.com**

                                    **Attorneys for Plaintiff**
                                    **Bonnie B. Finkel, Chapter 7 Trustee**